UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Father & Mother Doe,                            Opinion No. 2022 DNH 155P
individually and as parents and
next friends of John Doe

           v.                                   Civil No. 22-cv-194-LM

West Alton Marina, LLC et al.

James Doe

           v.                                   Civil No. 22-cv-195-LM

West Alton Marina, LLC et al.

Charley Doe

           v.                                   Civil No. 22-cv-226-LM

West Alton Marina, LLC et al.

Edward Doe

           v.                                   Civil No. 22-cv-236-LM

West Alton Marina, LLC et al.

Father Doe, Mother Doe & David Doe

           v.                                   Civil No. 22-cv-240-LM

West Alton Marina, LLC et al.


**O R D E R**

In this matter, five child victims (David, Edward, James, Charley, and John)

allege that they suffered sexual assaults and abuse while working at the West Alton

Marina.[1]  Each victim brings a lawsuit against the Marina and the primary perpetrator, John Murray, as well as three other defendants, Brian Fortier, Deirdre Tibbetts, and Allyson Shea.  The five lawsuits are consolidated for purposes of discovery and pretrial litigation.

Fortier, Tibbetts, and Shea are siblings and part-owners of the Marina. Fortier is married to Murray.  Murray and Fortier are charged in state court with sexual assault crimes related to alleged abuse of minor employees.  Murray is also a defendant in this court; he is indicted on twelve counts of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) & (e), and four counts of sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a)(1), (b)(2), & (c).  There are at least two similar civil cases pending in Belknap County Superior Court brought by two other child victims of sexual assault at the Marina.  Adam Doe v. West Alton Marina, LLC, et. al., No. 211-2022-cv-00075 (N.H. Super. Ct. Aug. 30, 2022); Brian Doe v. West Alton Marina, LLC, et. al., No. 211-2022-cv-00076 (N.H. Super. Ct. Aug. 30, 2022).

This case presents the question of whether defendants can be liable for intentional infliction of emotional distress ("IIED") where the child victims allege that the defendants knew of Murray's abuse but did not nothing to stop it and, in fact, facilitated Murray's access to the children by putting him in the role of direct manager and supervisor of these children.  Fortier, Tibbetts, and Shea urge the court to answer this question in the negative.  Defendants argue that in IIED cases

---

[1]Because David is still a minor, his parents bring the case on his behalf.

involving harassment, abuse, or assault, only the actual perpetrator of the harassment, abuse, or assault can be liable for the resulting emotional harm.  For example, they contend that — even if these child victims alleged that these defendants watched Murray sexually assaulting them and did nothing to stop it — a claim for IIED could not lie against them.  The court disagrees.

## STANDARD OF REVIEW

When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court asks whether the plaintiff has made allegations in his pleadings that are sufficient to render his entitlement to relief plausible.  See Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 43 (1st Cir. 2013).  The court accepts all well-pleaded facts as true and draws all reasonable inferences in the non-moving party's favor.  Hamann v. Carpenter, 937 F.3d 86, 88 (1st Cir. 2019).  The court, however, disregards conclusory allegations that simply parrot the applicable legal standard. Manning, 725 F.3d at 43.

## BACKGROUND

The factual summary is divided into two parts.  First, the court summarizes each victim's description of the abuse.  Second, the court details the allegations regarding Fortier's, Tibbetts' and Shea's awareness of the abuse.  These facts are summarized in a manner favorable to plaintiffs.

I.   <u>The alleged conduct</u>

With the exception of John, who was 17, each victim was 15 years old at the time they began working at the Marina. And with the exception of Charley, whose

allegations focus more on the normalization of sexual abuse of minors at the Marina (i.e., she does not allege that Murray habitually abused her), each victim describes Murray using his position as their boss to groom and subject them to various forms of sexual abuse.

A.   Edward

Edward alleges that, a few months after Murray hired him, Murray approached him, forcibly hugged him, and grabbed his crotch. Edward tried to escape but could not. Murray's assaults continued and escalated. Murray isolated Edward from other employees and forced him to engage in masturbation and oral sex. If Edward resisted these recurring assaults, Murray responded with anger and by assigning him the most physically demanding tasks. But, if he did not resist, Murray paid Edward $100 after each encounter and assigned him easier jobs. Eventually Murray forced Edward to touch him, and Murray took photographs of them naked together. The abuse continued throughout the entirety of Edward's employment at the Marina (2015 through August 2017).

B.   James

James alleges that Murray slapped him on the buttocks and kissed him on the head and neck at the Marina and in front of customers. Murray set up a place on Marina property where employees could go to view pornography and masturbate while at work. Murray told James about this place, which Murray and other employees called the "jack shack." Murray encouraged James to utilize it. Murray solicited sexually explicit photos from James in exchange for money, and Murray

sent James videos of Murray engaging in sexual activity.  Murray required James
to go to his office to watch sexually explicit videos of Murray.  Murray groomed
James in much the same way Edward describes: paying him for sexually explicit
videos but punishing him for resisting.  While James describes the abuse as
occurring throughout the time he worked at the Marina (2018-2021), James alleges
it escalated and was its worst in 2021.

    C.    <u>John</u>

    John alleges that Murray engaged in the same sort of grooming of him.
Murray solicited sexually explicit photos for John and sent John videos of Murray
engaging in sexual activity with others.  Murray demanded that John go to his
office, where Murray made John watch Murray masturbate, and Murray coerced
John to allow him to perform sex acts on John, including "manual masturbation and
fellatio."  22-cv-194, doc. no. 1-1 ¶ 66.  Murray also told John that he was in a sexual
relationship with the Gilford Chief of Police and that he would get John involved in
sex with the chief so that John would be afraid to report the abuse.  John worked at
the Marina from May 2021 through August 2021.

    D.    <u>David</u>

    David alleges that Murray showed him sexually graphic photos and videos,
spoke to him about sex, and asked him about his sexual experiences.  Murray
touched David's buttocks, kissed him on the head, and hugged him without consent.
Murray also sent David sexual text messages and wrote him handwritten notes.
David worked at the Marina from May through October during 2020 and 2021.

E.      Charley

Charley is the only female plaintiff.  Charley's allegations do not include
repeated assaults, although she alleges one incident where Murray touched her on
the buttocks and laughed in response to Charley making clear that she did not
invite his touching.  Charley was assigned to clean Murray's workspace.  While
trying to do that job, Charley saw pornographic photos and videos that Murray
displayed on his computer screen, including photos of naked employees, sexual
images of Murray, and a video of another employee masturbating.  Charley's co-
employees showed her sexually graphic text messages sent to them by Murray,
including photos and videos of Murray engaging in sex and a request that a co-
employee send Murray an "exceedingly graphic sex video."  22-cv-226, doc. no. 1-1
¶ 56.  Murray assigned more demanding jobs to Charley and paid her less than
those who exchanged sexual texts with him.  Charley worked at the Marina from
May through October during 2019, 2020, and 2021.

Plaintiffs' complaints also have some allegations in common.  For example,
Charley, David, and James allege that Murray invited employees to use the hot tub
at his and Fortier's home — but required them to use it naked, then watched and
photographed them.  James alleges that Fortier was also involved in the hot tub
incidents.  Each plaintiff alleges that Murray required the employees to wear
sexually suggestive and inappropriate t-shirts while at work, explaining that the
customers would like the shirts and would give them better tips.  As just one

example, a t-shirt contained an image suggestive of a person masturbating with the words: "If work isn't fun, you're not playing on the right team."

II.   <u>Defendants' prior awareness of Murray's abuse</u>

The extent to which Fortier, Tibbetts, and Shea (collectively "the owners") had prior or contemporaneous awareness of Murray's abuse is a central issue here. With respect to the owners' awareness and knowledge of Murray's abuse, all five of the complaints allege the following:

- Fortier was married to Murray at all relevant times. Fortier had a history of assisting Murray's sexual abuse.[2]  All three owners supervised Murray in his managerial role at the Marina.

- Tibbetts and Shea were on-site supervisors and managers.  That is, they worked on-site at the Marina. Tibbetts was responsible for employee hours and wages, and Shea was the fulltime manager at the docks.  Some of Murray's sexual assaults, harassment, and abuses happened openly and directly before the owners.

- Prior to plaintiffs' employment at the Marina, the owners knew Murray had been accused of sexually abusing and assaulting other employees, yet they put him in charge of supervising the children who worked there.[3]

---

[2] The only claims Fortier moves to dismiss are those brought by Edward and David.

[3] Each plaintiff makes this allegation.  Edward alleges the owners "saw, should have seen, and were directly made aware of Murray's sexual assaults, and abuse." 22-cv-236, doc. no. 1 ¶ 18.  Throughout the complaints, plaintiffs refer to the owners being aware of "subordinate employees" as victims of Murray's abuse.  Defendants make much of the inartful use of the phrase "subordinate employees" in the complaint.  Each complaint, however, includes the following allegation: the owners "knew that Murray assaulted and abused other minors and/or subordinate employees and used the hiring process to find minors/subordinates to whom he was sexually

- Murray hired the employees at the Marina.  He hired a large number of minors to whom he was sexually attracted to work at the Marina.  He then groomed those children and sexually assaulted or harassed them.  The owners put Murray in the position to make these hiring decisions despite being aware of his "misuse of" the hiring process.

- The owners knew that Murray assigned minor employees work at his (and Fortier's) personal residence.

- The owners knew that Murray used his personal property to coerce employees into sexual activity.

- Despite the owners' awareness of Murray's sexual harassment, assault, and abuse, they did nothing to protect the minor employees, including through an investigation of the allegations.

- Through their inaction and omissions, the owners condoned Murray's abuse.

Some of the complaints make additional allegations with respect to the

defendants' knowledge and awareness of Murray's abuse:

- James, John, David, and Charley allege that Murray engaged in inappropriate, sexual contact with employees in front of the owners.  The specific allegations, which are similar but not identical, include that Murray sexually groped employees, grabbed their crotches, slapped their buttocks, kissed them on the head and neck, and massaged their backs and hips.  John further alleges that Murray once hugged him with a noticeable erection.

- Edward, David, Charley, and John allege that Murray would openly allow his victims to use his personal vehicles, sometimes for lengthy periods of time.

---

attracted and/or whom he could groom and kept him in this position despite this knowledge."  E.g., id. at ¶ 138; 22-cv-195, doc. no. 1-1 ¶ 209.  Read favorably to plaintiffs, as the complaints must be at this stage, the phrase "subordinate employees" is inclusive of the word "minors."

- Edward, David, and Charley reference an annual event at the Marina, the "Cabana Crawl," where minors were allowed to consume alcohol. The owners were aware that minors would become drunk at this event but did nothing to stop it. At the 2020 event, Charley alleges that a 15-year-old employee became heavily intoxicated and then was sexually assaulted. The owners knew but took little or no action in response. Charley alleges that the following summer, the Alton police responded to the event after an employee reported Murray's misconduct.

- Charley alleges that the owners knew about Murray's Venmo account from which Murray paid minor victim employees for sex acts and sexually explicit photos and videos.

- John alleges that "[a]dult employees of the Marina specifically advised the owners . . . of Murray's abuse, harassment, and assaults of subordinate employees. . . ." 22-cv-194, doc no. 1-1 ¶ 104. Charley alleges that she told Shea about Murray's inappropriate conduct at the Marina, but Shea did nothing.

- Charley and David allege that the owners knew that prior to 2019, employees had complained that Murray had videotaped minors and "that was potentially improper sexual conduct" toward the minors.

The only claims plaintiffs assert against the owners are IIED claims.[4]

Fortier moves to dismiss the IIED claims against him brought by Edward and David; the Marina moves to dismiss the IIED claim against it brought by Edward;

---

[4]In response to Tibbetts's and Shea's motions to dismiss, John Doe withdrew the RSA 354-A claims (employment-based harassment and hostile work environment) against Fortier, Tibbetts, and Shea. As to the RSA 354-A claims, Tibbetts's and Shea's motions to dismiss are therefore granted. Because John Doe indicated the claim was withdrawn as to "all defendants," the RSA 354-A claim against Fortier is likewise dismissed.

and Tibbetts and Shea move to dismiss the IIED claims of all five plaintiffs.[5]  The defendants argue that they did not commit the alleged sexual abuse and harassment and cannot, therefore, be found liable for IIED.[6]

## DISCUSSION

The defendants move to dismiss under Rule 12(b)(6), arguing that plaintiffs fail to state a claim of IIED under New Hampshire law.  For the reasons that follow, the court finds that—at this early stage—plaintiffs' IIED allegations are sufficient to survive the motions to dismiss.

The Supreme Court of New Hampshire recognizes a claim of IIED modeled after the Restatement (Second) of Torts § 46 (1965).  Morancy v. Morancy, 134 N.H. 493, 496 (1991).  To state a claim of intentional infliction of emotional distress in New Hampshire, a plaintiff must allege that a defendant: (1) by extreme and outrageous conduct, (2) intentionally or recklessly caused (3) severe emotional distress.  Morancy, 134 N.H. at 496.

_____

[5]The five defendants move to dismiss all claims Edward asserts against them on statute of limitations grounds.  For reasons explained on the record during the November 9, 2022 hearing, those arguments lack merit and the motions to dismiss on that basis are denied.

[6]Defendants also argue that plaintiffs' complaints, when considered separately, do not allege facts sufficient to show that defendants had actual knowledge of Murray's history of abusing minor employees, and thus, the defendants cannot be liable for any of the resulting harm.  As can be seen supra in the summary of plaintiffs' separate allegations of defendants' knowledge, this argument lacks merit—especially at this stage—where the court must give the allegations a favorable reading to plaintiffs.

To satisfy the first element (extreme and outrageous), the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723, 729 (2009) (citing Restatement (Second) of Torts § 46, cmt. d).  In deciding whether allegations are sufficient to state a claim of extreme and outrageous conduct, courts consider factors, including whether: (a) the plaintiff has "particular susceptibility to emotional distress" of which the defendant was aware, Karch v. BayBank FSB, 147 N.H. 525, 531 (2002); (b) the defendant abused a "position of power over" the plaintiff, Mikell, 158 N.H. at 729; and (c) the defendant's conduct occurred "regularly and persistently," Miller v. CBC Companies, Inc., 908 F. Supp. 1054, 1068 (D.N.H. Nov. 29, 1995).

 With respect to the second element, the actor must cause emotional distress either intentionally or recklessly.  Restatement (Second) of Torts § 46.  To show intentionality, plaintiff must allege a defendant acted with a "desire[] . . . to inflict" the distress or with knowledge that it is certain or substantially certain to occur. Id., cmt. i.  To show recklessness, plaintiff must allege defendant acted "in deliberate disregard of a high degree of probability that emotional distress will follow."  Id.

Finally, with respect to the third element (severe emotional harm), "[t]he law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." Morancy, 134 N.H. at 496 (quoting Restatement

(Second) of Torts § 46, cmt. j).  Because "some degree of transient and trivial emotional distress is a part of the price of living among people," id., the bar to establish intentional infliction of emotional distress is unquestionably "very high." Martin v. Mooney, 448 F. Supp. 3d 72, 87 (D.N.H. 2020).  Liability does not extend to situations that may very well be upsetting but are nonetheless a consequence of regular participation in society.  And, even if emotional harm is inflicted for no legitimate reason, the law nonetheless declines to intervene "in every case where some one's feelings are hurt."  Restatement (Second) of Torts § 46, cmt. d.

In their motions to dismiss, defendants do not dispute that, if true, plaintiffs' allegations against Murray (the alleged perpetrator of the abuse) state an IIED claim.  Defendants instead argue that the allegations are insufficient to state a claim against them — where they, at worst, knew of Murray's abuse and did not intervene.  They contend that inaction can never satisfy two of the elements of IIED.

Defendants' arguments are unpersuasive on two levels: one factual and the other legal.  First, as a matter of fact, defendants' characterization of the allegations against them fails to account for the broad and favorable construction of the facts that is required at this stage.  The complaints allege that defendants took action to facilitate the abuse by placing Murray in a hiring and supervisory position, which gave Murray constant and direct access to the children.  To describe the claim as alleging merely "inaction" on defendants' part ignores the facilitation aspect of the allegations.

Second, as a legal matter, defendants read the case law too narrowly.  Simply because the New Hampshire Supreme Court has not yet opined on IIED law in a case like this does not mean that it would not recognize a claim with these allegations.  A close examination of the law provides support for plaintiffs' argument that dismissal of these claims at this early stage would be premature. Although the defendants' legal arguments deal primarily with the first and second elements of IIED (i.e., extreme and outrageous conduct and the mental state), the court addresses all three prongs under New Hampshire law.

I.     <u>New Hampshire law supports a finding that plaintiffs' IIED claims are sufficient to survive these motions to dismiss.</u>

As explained, the facts of this case present a question of first impression in New Hampshire: does an allegation that adults facilitated child sexual abuse in a workplace (without any evidence that they perpetrated the abuse) suffice to state a claim of IIED?  Because this question has yet to be directly addressed by the New Hampshire Supreme Court, the court begins with a summary of the IIED cases the Court has decided since it formally recognized IIED.

In <u>Morancy</u>, the first case recognizing IIED, the New Hampshire Supreme Court upheld the dismissal of the claim where the trial court found that plaintiffs failed to sufficiently allege severe mental distress, a required element of the tort under the Restatement.  134 N.H. at 496.  Though the case did not require the court to elaborate further, the court made clear it would rely on the Second Restatement to analyze IIED claims.  <u>Id.</u> at 495.

In its second case, the New Hampshire Supreme court held that a run-of-the-mill employment dispute does not rise to the level of an IIED claim. Konefal v. Hollis/Brookline Co-op Sch. Dist., 143 N.H. 256, 260 (1998). In Konefal, a teacher brought an IIED claim against her school district after it did not to renew her contract, allegedly because she refused to join the union. Id. at 257. The court held that, although the school district's decision might support a claim for wrongful termination, that alone does not constitute extreme and outrageous conduct. Id. at 260.

In its third IIED case, the New Hampshire Supreme Court found that an employee stated a claim for IIED against her supervisor. Karch v. BayBank FSB, 147 N.H. 525, 531 (2002). The plaintiff in Karch alleged that her supervisor used an illegally intercepted telephone conversation between the plaintiff and a co-worker, which took place outside the workplace and after hours, to accuse the plaintiff of misconduct. Id. at 528-29. The court found that the supervisor's alleged behavior, which included threats to "monitor the plaintiff's conversations and discipline her without cause or legal right to do so," was extreme and outrageous. Notably, the court found relevant the supervisor's position of power and her knowledge of the plaintiff's susceptibility to emotional distress. Id. at 531.

In the fourth IIED case, Mikell, a mother alleged that a teacher falsely reported misconduct by her seventh-grade son to the school. 158 N.H. at 726. The teacher reported that the son falsely described mints on his desk as medicine. The son committed suicide the next day and left a note which stated, among other

things, that he had been telling the truth about the mints the day prior.  Id. at 726.

Although the son had clearly suffered extreme emotional distress from the conduct,

the court focused on the nature of the teacher's alleged conduct, that is, falsely

reporting that the son described mints as medicine.  The court held that the

teacher's conduct did not rise to the level of extreme and outrageous.  Id. at 729.

Most recently, in Tessier v. Rockefeller, 162 N.H. 324 (2011), the plaintiff

alleged that she suffered severe emotional distress from threats the defendants

made to her husband about repaying allegedly stolen money.  Id. at 328-29.  The

court found the plaintiff failed to state an IIED claim, reasoning that the

defendants did not directly threaten her, and, even if they had, mere threats do not

constitute extreme and outrageous conduct.  Id. at 341.

Having summarized the case law in New Hampshire, the court now focuses

on the three elements of plaintiffs' IIED claims.

A.   <u>Plaintiffs' allegations that defendants allowed and facilitated sexual
abuse of minors in a workplace are sufficient to meet the "extreme and
outrageous" prong.</u>

The aforementioned five cases make clear that there is a high bar to establish

the first prong of IIED (extreme and outrageous conduct) under New Hampshire

law.  However, none of these cases deals with allegations such as those present

here, namely, an employer's long-term facilitation and normalization of sexual

assault of minors in a workplace.  And nothing in the existing body of New

Hampshire Supreme Court caselaw suggests that it would hold that the egregious

conduct alleged here is not, as a matter of law, extreme and outrageous.[7]  On the contrary, the Mikell and Karch decisions illustrate that courts examining IIED cases under New Hampshire law should be persuaded by factors such as a defendant's awareness of the particular vulnerabilities of a plaintiff (and the power dynamic at play in the relationship) to determine if the conduct rises to the level of extreme and outrageous.  See Mikell, 158 N.H. at 729; Karch, 47 N.H. at 531.

There are two cases from this court which have held that New Hampshire law permits an IIED claim where a plaintiff alleged that a defendant supervisor failed to prevent his subordinate from harassing or abusing the plaintiff.  Duguay v. Androscoggin Valley Hospital, No. 95-cv-112, 1996 WL 157191, at *1 (D.N.H. Jan. 25, 1996); Graham v. Warden, No. 7-cv-247, 2008 WL 2699671, at *7-8 (D.N.H. June 30, 2008).  In Duguay, the plaintiff alleged that the president of a company knew about but failed to take adequate measures to stop his subordinate vice president's harassment of the plaintiff.  1996 WL 157191, at *1.  The plaintiff alleged that over the course of eight years, the vice president consistently made sexually suggestive comments to her and on one occasion made inappropriate physical contact with her. Id.  She told the president, who investigated the allegations but failed to ensure the harassment had ended.  Id.  While conceding that the plaintiff's complaint against the president was "shaky" compared to her claim against the vice president, the court allowed the claim to move to discovery.  Id. at *5.

---

[7]But see Brian Doe v. West Alton Marina, LLC, et. al., No. 211-2022-cv-00076, doc. no. 40, at *3 (N.H. Super. Ct. Aug. 30, 2022) (agreeing with defendants that these allegations do not support an IIED claim under New Hampshire law).

And, in Graham, a state prisoner brought a claim of IIED against several corrections officers whom he alleged subjected him to highly inappropriate and dehumanizing strip searches.  2008 WL 2699671, at *7-8.  The plaintiff also brought IIED claims against the Commissioner of the New Hampshire Department of Corrections and the prison's warden, alleging he informed them of the incidents but they failed to take corrective action.  Id.  The court found the plaintiff alleged sufficient facts for his claim to survive defendants' motions to dismiss.  Id.

Duguay and Graham provide support for the absence of a categorical rule under New Hampshire law distinguishing between actors who directly perpetrate harassment and the individuals or entities who supervise them.  These cases instead demonstrate that in deciding whether a defendant's conduct is extreme and outrageous, a court must focus on the totality of facts concerning the defendant's conduct.

Defendants point to several cases where federal courts have applied New Hampshire IIED law but rejected the claims as insufficiently outrageous.  See Drake v. Town of New Boston, No. 16-CV-470, 2017 WL 2455045 (D.N.H. June 6, 2017); Maynard v. Meggitt-USA, Inc., No. 14-CV-467, 2015 WL 1538004, at *3 (D.N.H. Apr. 7, 2015); Bethany T. v. Raymond Sch. Dist. with Sch. Admin. Unit 33, No. 11-CV-464, 2013 WL 1933756, at *1 (D.N.H. May 10, 2013); Purdy v. City of Nashua, No. 98-627, 2000 WL 620579, at *10 (D.N.H. Apr. 17, 2000); Brewer v. K.W. Thompson Tool Co., 647 F. Supp. 1562, 1567 (D.N.H. Nov. 21, 1986).  These cases generally reiterate both (a) the high bar required to state such a claim and (b)

that allegations of workplace misconduct rarely suffice.  However, like those cases decided by the New Hampshire Supreme Court, none of these cases involves allegations where the employee-plaintiff is a minor and the employer-defendant is aware of (and facilitates) the minor's sexual abuse by an adult employee over a long period of time.  And, rather than establishing any categorical rules about what conduct may be considered extreme and outrageous, these cases call for a fact-intensive analysis to decide the question.

For example, defendants rely heavily on Drake to support their position. 2017 WL 2455045, at *11.  In Drake, the plaintiff, a police officer, brought a claim of IIED against her police chief and town selectmen after she was fired.  Id. at *10. The plaintiff alleged that they fired her in retaliation for reporting sexual harassment by her co-worker, who frequently made sexual and sexist remarks in her presence.  Id.  The defendants were not, as the court explained, "the perpetrator[s] of the harassment."  Id. at *11 (distinguishing Yale v. Town of Allenstown, 969 F. Supp. 798, 801 (D.N.H. 1997)).[8]  The court held that the alleged

---

[8]In Yale, the court held that the plaintiff stated a claim for IIED against her immediate supervisor when she alleged that he "repeatedly made sexual advances towards her comprised of vulgar remarks, sexual innuendo and non-consensual touching."  969 F. Supp. at 801.  When she rejected his advances, the defendant spread disparaging rumors about her to harm her career.  Id.  Notably, Yale is not the only case where a court applying New Hampshire law found allegations of sexual misconduct in the workplace sufficient to state an IIED claim.  See Trudell v. Spaulding Composites Co., et al., No. 97-cv-181, at *2 (D.N.H. Jan. 12, 1998).  In Trudell, the court found plaintiff stated an IIED claim where she alleged one of her supervisors persistently made nonconsensual physical contact and offensive sexual remarks.  Id. at *8.

conduct—terminating the plaintiff in retaliation for reporting sexual harassment—did not rise to the level of extreme and outrageous, characterizing the claim as arising from commonly-alleged workplace misconduct (e.g., retaliation, failure to investigate, and wrongful termination).  Such misconduct, the court explained, rarely qualifies as extreme and outrageous.  Id. at *10; see also Maynard, 2015 WL 1538004, at *3 (stating that workplace misconduct "generally" does not amount to extreme and outrageous conduct).

Defendants argue that Drake holds that a supervisor's failure to adequately respond to reports of harassment cannot, as a matter of law, constitute extreme and outrageous conduct.  In so arguing, defendants ignore Duguay and Graham and extend Drake well beyond its holding.  Drake, Maynard, and the many similar cases referenced by defendants, stand, at most, for the proposition that allegations of workplace misconduct ordinarily will not be extreme and outrageous enough to state an IIED claim.  Here, however, plaintiffs make allegations that could never be characterized as "ordinary" workplace misconduct.  The allegations involve a workplace with child-employees whom defendants placed in harm's way by assigning Murray, an adult with a known history of abusing minors, the job of acting as their direct supervisor.  If true, the allegations are "atrocious and utterly intolerable."  Drake, No. 16-CV-470, 2017 WL 2455045, at *11.

To be sure, some courts outside New Hampshire have held that conduct is not extreme and outrageous where an entity failed to stop an individual under its authority from sexually abusing minors.  See Doe v. Town of Bourne, No. 02–11363,

19

2004 WL 1212075, at *12–*13 (D. Mass. May 8, 2004); Doe v. Bradshaw, Civ. Action No. 11-11593-DPW, 2013 WL 5236110, at *13 (D. Mass. Sep. 16, 2013).  These cases, however, are readily distinguishable from the facts here.  In Bourne, for example, the court found the plaintiff failed to state a claim where a school failed to promptly inform a student's parents and police after learning three years after-the-fact that the student had been raped on campus.  2004 WL 1212075, at *12–*13. Because the perpetrator had graduated by the time the school learned about the incident, the school did not consciously disregard a known risk to its students.  Id. Additionally, in Bradshaw, the court found that a school's conduct was not extreme and outrageous when it failed to prevent an assault of a student by a coach with two prior accusations of sexual assault.  2013 WL 5236110, at *13.  The court was persuaded by the fact that the school had investigated those allegations and the coach credibly denied wrongdoing.  Id.

Here, unlike Bourne and Bradshaw, plaintiffs allege that defendants knew about and made no effort to stop the abuse by Murray.  The owners therefore consciously disregarded a known risk to their minor employees.  Additionally, in this case, plaintiffs allege that defendants facilitated the abuse by placing Murray in the role of plaintiffs' direct supervisor.

In sum, there is nothing in the case law of New Hampshire or other jurisdictions following the Second Restatement that suggests that the "extreme and outrageous" requirement can only be met, as defendants argue, when the defendant directly harasses, abuses, or assaults a plaintiff.  On the contrary, courts applying

New Hampshire law have allowed claims against a direct perpetrator's supervisor where the facts are egregious.

B.   <u>Plaintiffs have sufficiently alleged that defendants recklessly caused them emotional harm.</u>

In addition to extreme and outrageous conduct, the plaintiff must allege facts showing that the defendant "intentionally or recklessly" caused the plaintiff to suffer severe emotional distress.  <u>Morancy</u>, 134 N.H. at 496.  Plaintiffs have done so here.

Under the Second Restatement, the mental state of recklessness requires a "deliberate disregard of a high degree of probability that emotional distress will follow."  Restatement (Second) of Torts § 46, cmt. i.  Importantly, the definition of reckless conduct applies equally to action and inaction.  A person behaves recklessly if he "knows, or has reason to know. . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or fails to act, in conscious disregard of, or indifference to, that risk."  Restatement (Second) of Torts § 500 cmt. a (cleaned up); <u>see also</u> <u>Turley v. ISG Lackawanna, Inc.</u>, 774 F.3d 140, 161 (2d Cir. 2014) (noting that under New York law, which generally follows the Restatement, "an IIED claim does not turn on a distinction between action and omission").  Further, a finding of recklessness does not require an allegation that an actor aim his conduct toward a specific person.  <u>Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville</u>, 154 S.W. 3d 22, 31 (Tenn. 2005) ("Recklessness cannot require that the actor aim the conduct toward a specific person or a specific

result, for to do so would contradict the inattentive and thoughtless nature of disregard.").

Courts applying New Hampshire law have found the recklessness prong is met in cases brought against supervisors who fail to prevent their subordinates from engaging in extreme and outrageous conduct. As explained supra, in Duguay, the court found that the facts alleged in the plaintiff's complaint were sufficient to support the conclusion that the president of a company acted recklessly when he was aware of, but failed to prevent, harassment of the plaintiff by his subordinate employee. 1996 WL 157191, at *5. Additionally, in Graham, the court found that the plaintiff had alleged the minimum facts necessary to state a claim for IIED against individuals who did not harass the plaintiff, but instead failed to stop the harassment. 2008 WL 2699671, at *8.

Courts that, like New Hampshire, follow the Second Restatement (and apply its recklessness mental state) have found that individuals and entities can be held liable for IIED even when they do not directly harass, assault, or abuse the plaintiff. See Doe 1, 154 S.W. 3d at 31; Pollard v. E.I. DuPont De Nemours, Inc., 412 F.3d 657 (6th Cir. 2005); John Doe CS v. Capuchin Franciscan Friars, 520 F. Supp. 2d 1124 (E.D. Mo. Feb. 23, 2010); Bonson v. Diocese of Altoona-Johnstown, 67 Pa. D. & C.4th 419, 422, 439 (Ct. Com. Pl. 2004); Baldonado v. El Paso Natural Gas Co., 143 N.M. 297, 305 (N.M. Ct. App. 2006), aff'd 143 N.M. 297, 176 (2007).

In Doe 1, victims of sexual assault by a priest and the victims' parents brought IIED claims against the priest's former employer, a Catholic diocese that

22

allegedly knew of the priest's history of sexually abusing minors and did not stop it. 154 S.W. 3d at 31. The Tennessee Supreme Court reversed the appellate court's decision to grant summary judgment in favor of the defendant-employer, finding that to be liable the diocese need not have intended that severe emotional distress befall these specific plaintiffs.[9] Id. at 39-40. The court allowed the IIED claim to proceed even though there was no evidence that the defendant-employer participated in the sexual assault. Rather, the court found it sufficient that plaintiff had shown the defendant had awareness of the priest's history and failed to respond to the known risk. Id. at 42.

And, in Pollard, the Sixth Circuit held that under Tennessee law a defendant employer could be held liable for knowing of — but failing to effectively investigate or otherwise appropriately address — outrageous discriminatory conduct occurring in its workplace. 412 F.3d at 665. Based on the holding of Doe 1, the court concluded that "a corporate body may be liable for the infliction of emotional distress if its corporate supervisors and officials engage in conduct that arises to the level of reckless disregard for outrageous conduct." Id.; see also Capuchin Franciscan Friars, 520 F. Supp. 2d at 1134 (finding that plaintiff stated a claim of IIED where defendants allegedly retained a perpetrator of sexual abuse of minors "in a position where he had access to students regardless of the knowledge that he abused students and without taking any action to prevent him from doing so

_____

[9] The Tennessee Supreme Court cited Morancy to indicate that New Hampshire, like Tennessee, is among the overwhelming majority of jurisdictions that follow the Second Restatement of Torts.

again"); Bonson, 67 Pa. D. & C.4th at 438-39 (finding that the parent of a victim of Catholic Church's sex abuse scandal sufficiently stated a claim of IIED against the diocesan defendants, which included the diocese itself and two of the bishops overseeing it, because it knew or should have known that its priests "had predatory sexual impulses toward children and adolescents" yet "permitted the dangerous priests to remain"); Baldonado, 143 N.M. at 305 (finding the neither the Second Restatement nor the Supreme Court's formulation of the tort of IIED requires that a claim "include an allegation that the defendant's conduct was directed at the plaintiff").

The court is persuaded that under the version of IIED followed in New Hampshire, plaintiffs have sufficiently stated claims at this early stage.  Plaintiffs allege that defendants did more than just fail to act; plaintiffs allege that defendants knew of Murray's history of abuse, failed to stop it, and, in fact, facilitated the abuse.  See also Restatement (Third) of Torts § 46, cmt. i (2012) (noting that "if a school recklessly ignores a pattern of child abuse by an employee, thereby posing a risk that some yet-unidentified children will suffer similar harm in the future, the 'directed at' limitation does not shield the school from liability to those who are later abused by the offending employee").[10]

---

[10]Defendants rely heavily on a case in a jurisdiction that does not recognize that IIED can be caused recklessly. Roe v. Hotchkiss Sch., 385 F. Supp. 3d 165 (D. Conn. 2019).  In Roe, a former student brought a claim of IIED against a school, alleging he suffered sexual abuse at the hands of an athletic trainer whose abuse of students was "widely known and frequently publicly commented on."  Id. at 167. The court dismissed the claim, holding that under Connecticut law, plaintiffs'

C.   <u>Plaintiffs' complaints sufficiently allege severe emotional distress.</u>

Lastly, each plaintiff alleges that they suffered "serious emotional distress" from the abuse.  22-cv-194, doc. no. 1-1 ¶ 173; 22-cv-195, doc. no. 1-1 ¶ 203; 22-cv-226, doc. no. 1-1 ¶ 234; 22-cv-236, doc. no. 1 ¶ 145; 22-cv-240, doc. no. 1 ¶ 199.  With respect to severe emotional harm, "[t]he law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." <u>Morancy</u>, 134 N.H. at 496 (quoting Restatement (Second) of Torts § 46, cmt. j).  The alleged sexual assaults caused these plaintiffs to suffer distress "so severe that no reasonable person could be expected to endure it." <u>See id.</u>  Defendants do not appear to contest this element, and the court finds these allegations sufficient.

In sum, based on the totality of circumstances, plaintiffs have alleged enough to get past a motion to dismiss at this earliest stage in the case.  Plaintiffs have yet to conduct any discovery.  These cases present a unique fact-pattern, and the allegations are egregious.  The question of how much defendants knew is highly fact-intensive (whether intentional or reckless).  It is not necessary under the Rule 12(b)(6) standard to require the child victims in these cases to allege detailed facts at this early stage about the mental states of the defendant-owners.[11]  What they

---

allegations of IIED "must be based on more than allegations of neglectful or even reckless behavior." <u>Id.</u>

[11] The state court order describes one of the other child victims (Brian) as having alleged that he told Tibbetts and Shea "repeatedly" about the abuse, including "showing them pictures that Murray had sent him of his erect penis." <u>Brian Doe v. West Alton Marina, LLC, et al.</u>, No. 211-2022-cv-00076, doc. no. 40, at *3 (N.H. Super. Ct. Aug. 30, 2022).  Brian worked at the Marina from August 2016 through late July

have alleged, when considering each complaint separately, is sufficient at this early stage to state a claim for IIED.

## CONCLUSION

Fortier's motions to dismiss Edward's (doc. no. 27, 22-cv-236) and David's (doc. no. 29, 22-cv-240) IIED claims on grounds of sufficiency of the pleadings are denied.  The Marina's motion to dismiss Edward's (doc. no. 27, 22-cv-236) IIED claim on grounds of sufficiency of the pleadings is denied.  Tibbetts's and Shea's motions to dismiss Edward's (doc. nos. 18 and 25, 22-cv-236), James's (doc. nos. 12 and 24, 22-cv-195), David's (doc. nos. 18 and 26, docket 22-cv-240), Charley's (doc. nos. 9 and 17 on docket 22-cv-226), and John's (doc. nos. 14 and 22, 22-cv-194) IIED claims on grounds of sufficiency of the pleadings are denied.  The motions to dismiss Edward's claims because they were not brought within the statute of limitations (doc. nos. 18, 25, and 27, 22-cv-236) are denied.   Finally, to the extent John alleges RSA 354-A claims against Tibbetts and Shea, the court grants the motions to dismiss (doc. nos. 14 and 22 on docket 22-cv-194) with respect to those claims.

---

or early August 2020.  According to Brian, they "sometimes simply laughed at the reports."  Id.  At another point, Tibbetts allegedly told Brian: "I don't know what to tell you but you're going to have to go to the State."  Id.  Not one of the five complaints in this case contains Brian's allegation — despite the fact that the same counsel apparently represents all the child victims in these cases.  The court notes the existence of Brian's allegations (as this is precisely the kind of allegation that discovery could unearth) but does not consider them in its ruling here.

Although Fortier did not move to dismiss John's RSA 354-A claim, that claim is dismissed for the reasons stated in the opinion.

      SO ORDERED.

_____
Landya McCafferty
United States District Judge

December 15, 2022

cc:  Counsel of Record.